AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)   ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| United States of America | |
| v. | |
| EDDIE ANTHONY GARCIA JIMENEZ, | Case No.   2:23-mj-00348-DUTY |
| Defendant. | |

**FILED**
CLERK, U.S. DISTRICT COURT

1/26/2023

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ jm _____ DEPUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of January 24, 2023, in the county of Los Angeles in the Central District of California, the defendants violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1): | Possession with Intent to Distribute a Controlled Substance |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____/s/_____
*Complainant's signature*

Naoki J. Nakamura, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:     1/26/2023     _____
*Judge's signature*

City and state:   Los Angeles, California     Hon. Michael R. Wilner, US Magistrate Judge
*Printed name and title*

AUSA: Siobhan M. Namazi x2424

## <u>AFFIDAVIT</u>

I, Naoki J. Nakamura, being duly sworn, declare and state as follows:

### I. <u>PURPOSE OF AFFIDAVIT</u>

1.    This affidavit is made in support of criminal complaints and arrest warrants against Eddie Anthony GARCIA JIMENEZ ("GARCIA JIMENEZ"), Emanuel CHAVEZ-SOTO ("CHAVEZ") and Jose Antonio ALONZO REYES ("ALONZO"), for a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance.

2.    This affidavit is also made in support of an application for a warrant to search the following digital devices in the custody of Homeland Security Investigation, in Los Angeles, California, (collectively, the "SUBJECT DEVICES") as described more fully in Attachment A:

   a.    SUBJECT DEVICE 1: one dark blue Nokia phone, Model N152DL with IMEI: 358205604406523 recovered from 1855 W. Commonwealth Avenue, Suite M, Fullerton, California (the "Warehouse," as described more fully below);

   b.    SUBJECT DEVICE 2: one black Samsung Phone with IMEI: 351347070358874, recovered from the Warehouse;

   c.    SUBJECT DEVICE 3: one purple Motorola Phone, Model XT2113-5 with IMEI 354959220760143 recovered from the Warehouse;

   d.    SUBJECT DEVICE 4: one blue Apple iPhone 13, Model ML9N3LL/A, Serial number QM36PIFWKN with IMEI: 355701903943433 recovered from CHAVEZ;

e.    SUBJECT DEVICE 5: one gray Apple iPhone 11 Pro Max, Model MWGK2LL/A, Serial number G6TD1419N70H with IMEI: 352850113158325, recovered from CHAVEZ;

f.    SUBJECT DEVICE 6: one black Samsung Galaxy S7 phone recovered from GARCIA JIMENEZ; and

g.    SUBJECT DEVICE 7: one dark blue Samsung Galaxy S22 Ultra, model SM-S908U, serial number R5CT121BPAA with IMEI: 359271108091970 recovered from ALONZO.

3.    The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (possession with intent to distribute controlled substances); 21 U.S.C. § 952 (importation of controlled substances);  and 846 (conspiracy and attempt to distribute controlled substances); 18 U.S.C. §§ 371 (conspiracy); 18 U.S.C. §§ 371 (conspiracy), 922(g) (prohibited person in possession of a firearm) and 924(c) (possession of a firearm in furtherance of a drug trafficking crime)(the "Subject Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrants, and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and

statements described in this affidavit are related in substance and in part only.

## II. **BACKGROUND OF AFFIANT**

5.   I am a Special Agent (SA) with the United States Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI).  I have been employed as a Special Agent with DHS/ICE/HSI since November of 2010.  Prior to assuming the current position, I was an Immigration Enforcement Agent with DHS ICE Office of Enforcement and Removal Operation from September 2007 to November 2010.  I successfully completed the Detention and Removal Operations Basic Law Enforcement Training Program (18 weeks), the Criminal Investigator Training Program (12 weeks), and the Immigration and Customs Enforcement Special Agent Program (11 weeks) which were held at the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia.  I have received training and gained experience to conduct investigations of civil and criminal violations of United States Code as enumerated in Titles 8, 18, 19, 21, 26, 31, and various other federal statutes.  Specifically, my training and experience encompasses the areas of immigration enforcement, financial fraud investigations, money laundering investigations, counter-proliferation investigation, smuggling investigations, and narcotics investigation and interdiction.  I am currently assigned as a SA with the Los Angeles Interagency Metropolitan Police Apprehension Crime Task Force ("LA IMPACT").  I have

conducted and assisted other agents in investigating numerous narcotics smuggling cases in the Central District of California.

6.    During the course of my employment as a law enforcement officer, I have received training regarding laws pertaining to arrest, search and seizure, and evidence collection.  I have also gained practical experience making arrests, conducting searches and seizures, and collecting evidence.  Additionally, I have had hundreds of hours of formal and informal training in a wide variety of investigative and other law enforcement subjects, including mobile surveillance and narcotics sales and trafficking investigations.  I have received numerous hours of instruction from SAs and detectives at LA IMPACT regarding narcotics packaging, sales, transportation, and usage.  I have received training from court qualified experts in the fields of criminal investigations and narcotics-related investigations.

### III.  SUMMARY OF PROBABLE CAUSE

7.    As detailed below, on January 24, 2023, U.S. Customs and Border Protection ("CBP") screened a 2007 Nissan Altima driven by GARCIA JIMENEZ JIMENEZ(the "Nissan Altima") at the Otay Mesa Port of Entry from Mexico in San Diego, California with the officer's certified drug detection dog and received a positive alert of the Nissan Altima.  A CBP Officer ("CBPO") scanned the Nissan Altima with a Z-Portal x-ray machine and observed anomalies within the floorboard area.

8.    CBPOs and investigators on scene conducted a physical inspection of the floorboard area.  CBPO Alexis Vizcarra

observed packages contained in the floorboards that were consistent with known methods of smuggling bulk amounts of illegal drugs from Mexico into the United States.  Specifically, Officer Vizcarra observed black plastic packages with blue tape and felt a hard substance contained within the black plastic.

9.   Investigators in the Southern District of California did not alert the driver of the car to their discovery and instead obtained a tracker warrant for the Nissan Altima. At approximately at 11:15 am, local law enforcement observed CHAVEZ make contact with GARCIA JIMENEZ and take possession of the Nissan Altima in Los Angeles County, California.

10.   At approximately 11:23 a.m., local law enforcement observed the Nissan Altima drive into the third roll up door at the Warehouse.  At approximately 1:01 p.m., CHAVEZ and an individual later identified as ALONZO were seen departing the Warehouse in the Nissan Altima, were followed by law enforcement as they left the Warehouse and detained during a traffic stop. Approximately two pounds of methamphetamine in a Ziploc bag were recovered in the trunk of the Altima, but the larger packaged items resembling drugs that were seen at the border were no longer in the floorboard of the Nissan Altima.

11.   Surveillance confirmed that from the time the Altima arrived at the Warehouse at approximately 11:23 a.m., until the time of the execution of the search warrant of on the Warehouse, no other vehicles or individuals entered or left the Warehouse. On January 24, 2023, the Honorable Alka Sagar authorized federal search warrants for the Warehouse, the Altima, and the persons

of GARCIA JIMENEZ and CHAVEZ in Case No. 23-MJ-302.  During execution of the search warrant at the Warehouse, officers found several firearms, ammunition and approximately 195 pounds of methamphetamine packaged in garbage bags.  The Honorable Alka Sagar subsequently authorized a rollback search warrant for the Warehouse authorizing the seizure of the firearms in Case No. 23-MJ-307.

12.  The CBP officer who observed the drugs in the Nissan Altima at the Otay Mesa Port of Entry was present for the execution of the search warrant at the Warehouse, and confirmed that the packages of methamphetamine found at the Warehouse were virtually identical in appearance to the packages he observed in the floorboards of the Nissan Altima.

13.  The seven SUBJECT DEVICES were seized from the Warehouse and defendants, as discussed below.

### IV. STATEMENT OF PROBABLE CAUSE

14.  Based on my review of law enforcement reports, my conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

15.  Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A.   CBP IDENTIFIES THE NISSAN ALTIMA CONTAINING SUSPECTED DRUGS AT THE OTAY MESA PORT OF ENTRY**

16.  On January 24, 2023, at approximately 7:53 a.m., the Nissan Altima entered the United States from Mexico through vehicle lane number 5 at the Otay Mesa Port of Entry in San

Diego, California.  The driver and sole occupant of the vehicle was GARCIA JIMENEZ.  During a primary inspection, a CBPO referred the Nissan Altima to secondary inspection based on unusual travel patterns.  There, an officer asked GARCIA JIMENEZ to exit the vehicle and GARCIA JIMENEZ was escorted to a security office, out of view of the secondary inspection area. When asked where he was headed, GARCIA JIMENEZ stated that he was on his way to Vista, California, which is located in San Diego County.  A CBPO Canine Enforcement Officer (CEO) screened the Nissan Altima with the officer's certified narcotics detection dog and received a positive alert of the Nissan Altima.  A CBPO scanned the Nissan Altima with a Z-Portal x-ray machine.  The CBPO observed anomalies within the floorboard area of the Nissan Altima.

17.  CBPOs and investigators on scene conducted a physical inspection of the floorboard area and observed packages contained therein consistent with known methods of smuggling bulk amounts of illegal drugs from Mexico into the United States.

18.  Based on training and experience, including having found packages similarly concealed in vehicles many times in the past which proved to contain drugs after field and lab testing, officers and agents believe the packages contained prohibited drugs.

19.  To facilitate further investigation, the packages were left in place and not opened or inspected and the driver was not

alerted to the discovery. Investigators decided to try to follow the Nissan Altima to its intended destination.

20. Because of the exigencies of the situation and to avoid a longer delay which might cause the driver or any co-conspirators to suspect or detect that the packages had been discovered by law enforcement, investigators installed a GPS tracking device on the Nissan Altima at approximately 8:11 a.m. so the Nissan Altima and GARCIA JIMENEZ could leave the Port of Entry and continue to their intended destination.  The tracking device was initially left in a mode that did not update or record location information, so that investigators could then obtain a tracking warrant for the Nissan Altima.  Investigators then began surveilling the Nissan Altima unaided by the tracking device.

21. At approximately 10:59 a.m., investigators obtained a warrant authorizing the use of a tracking device on the Nissan Altima, signed by the Honorable Daniel E. Butcher, U.S. Magistrate Judge for the United States District Court for the Southern District California.

**B.   SURVEILLANCE OF THE NISSAN ALTIMA**

22. Agents from HSI San Diego, along with detectives from the Hawthorne Police Department ("HPD"), Culver City Police Department, and other agencies, including LA IMPACT, who conducted aerial surveillance, conducted surveillance of the Nissan Altima driving along Interstate 5 from San Diego County to Los Angeles County.

23.   At approximately 11:05 am, the Nissan Altima got off from northbound of Interstate 5 at Brookhurst Street in Garden Grove, CA.  At approximately 11:09 am, the Nissan Altima entered the parking lot of a McDonalds located at 1341 S. Brookhurst Street, Fullerton, CA 92833.[1]

24.   At approximately 11:15 am, Sgt. John Benjamin with Culver City Police Department observed CHAVEZ make with GARCIA JIMENEZ and take possession of the Nissan Altima.  GARCIA JIMENEZ took possession of CHAVEZ's vehicle, a 2009 Jeep Patriot Sport.  CHAVEZ's vehicle incidentally contained a tracking device obtained through a state warrant pursuant to an investigation of CHAVEZ for drug trafficking.

### C.   THE NISSAN ALTIMA ARRIVES AT THE WAREHOUSE

25.   At approximately 11:23 a.m., Detective Thomas Heffner with Hawthorne Police Department observed CHAVEZ-SOTO drive the Nissan Altima into the third roll up door at the Warehouse, which was marked with an "M" corresponding with Suite M. This activity was also monitored by an aerial unit flown by LA IMPACT.

### D.   CHAVEZ AND ALONZO LEAVE THE WAREHOUSE IN THE NISSAN ALTIMA

26.   At approximately 1:01 p.m., Officer Tony Robles with Hawthorne Police Department observed CHAVEZ and an individual later identified as ALONZO drive the Nissan Altima out of the Warehouse.  The surveillance team followed the Nissan Altima.

---

[1]  The McDonalds parking lot is shared with Walgreens located at 1826 W Orangethorpe Ave, Fullerton, CA 92833.

27.   At approximately 01:05 pm, California Highway Patrol (CHP) K9 Officer Aaron Bingham conducted a traffic stop on the Nissan Altima.  CHAVEZ-SOTO, who was driving, made several inconsistent statements with respect to where he was coming from and where he was going to.  Officer Bingham conducted a K9 sniff which yielded a positive alert on the exterior and interior of the car.  Officer Bingham also observed the aftermarket trap underneath of front and rear floor appeared to empty although he could not confirm without removing the seats.  Officers recovered from the trunk approximately two pounds of a crystalline substance in a Ziploc bag.  The substance field tested positive for methamphetamine.  Based on the packaging and location of the methamphetamine, I believe it to be different than the substance identified by CBP that was located in the floorboards of the Nissan Altima.

28.  During a search incident to arrest, officers found two cell phones inside CHAVEZ's pocket:

a.   One blue Apple iPhone 13, Model ML9N3LL/A, Serial number QM36PIFWKN with IMEI: 355701903943433 (SUBJECT DEVICE 4).

b.   One gray Apple iPhone 11 Pro Max, Model MWGK2LL/A, Serial number G6TD1419N70H with IMEI: 352850113158325 (SUBJECT DEVICE 5)

29.  During a search incident to arrest, officers found on ALONZO's person a dark blue Samsung Galaxy S22 Ultra, model SM-S908U, serial number R5CT121BPAA with IMEI: 359271108091970 (SUBJECT DEVICE 7).

30.   Surveillance confirmed that from the time the Nissan Altima arrived at the Warehouse at approximately 11:18 a.m., until the time CHAVEZ and ALONZO departed the Warehouse at 1:01 p.m., no other vehicles or individuals entered or left the Warehouse.

**E.   GARCIA JIMENEZ TRAFFIC STOP**

31.   At approximately 1:06 p.m., CBP officers conducted a traffic stop of GARCIA in the Jeep Patriot Sport.  GARCIA was detained and CBP officers recovered on his person a one black Samsung Galaxy S7 phone (SUBJECT DEVICE 6).

**F.   A SEARCH OF THE WAREHOUSE YIELDS 195 POUNDS OF METHAMPHETAMINE AND FIREARMS**

32.   On January 24, 2023, the Honorable Alka Sagar, United States Magistrate Judge for the Central District of California, authorized warrants to search the Warehouse, the persons of GARCIA JIMENEZ and CHAVEZ, and the Nissan Altima.

33.   Law enforcement executed the warrant to search the Warehouse at approximately 6:54 p.m. on January 24, 2023.

34.   Inside the Warehouse, law enforcement found bulk amounts of drugs in plain sight.  Law enforcement seized approximately 195 pounds of methamphetamine, which were packaged in large, flattened trash bags.

35.   Law enforcement field tested the suspected drugs on site, and the results came back positive for methamphetamine.

36.   Inside the Warehouse law enforcement also found:

a.   Two AR-15 style assault rifles without serial numbers and four rifle magazines;

      b.   One handgun with a Polymer80 frame without a serial number, and a Glock slide bearing serial number BFPA162 and two handgun magazines;

      c.   38 rounds of ammunition;

      d.   Scales;

      e.   one dark blue Nokia phone, Model N152DL with IMEI: 358205604406523 (SUBJECT DEVICE 1);

      f.   one black Samsung Phone with IMEI: 351347070358874 (SUBJECT DEVICE 2), and

      g.   one purple Motorola Phone, Model XT2113-5 with IMEI 354959220760143 (SUBJECT DEVICE 3).

37.  Based on the drugs and firearms recovered at the Warehouse, the lack of significant furnishings or signs that the Warehouse was regularly inhabited, and based on my training and experience as a law enforcement officer, I believe the Warehouse to be a "stash pad" used by GARCIA JIMENEZ, CHAVEZ, ALONZO, and other potential co-conspirators to receive, store, and prepare illegal drugs for further distribution.

**G.    CBPO VIZCARRA RECOGNIZES THE PACKAGING OF THE DRUGS FOUND AT THE WAREHOUSE**

38.  CBPO Alexis Vizcarra was present during the execution of the search warrant at the Warehouse and inspected the packaging of the approximately 195 pounds of methamphetamine that was seized. Officer Vizcarra confirmed that the packages of methamphetamine found at the Warehouse were the same packages that he observed under the floorboards of the Nissan Altima at the Port of Entry.  Specifically, Officer Vizcarra recognized

the black bags with blue tape containing a large amount of chunky white crystalline substance, and also observed blue tape on the floor.  Based on his training and experience, Officer Vizcarra believed that the drugs were packaged using flattened trash bags in order to fit all of the drugs underneath the floorboards of the vehicle.



## V.  TRAINING AND EXPERIENCE ON FIREARMS OFFENSES

39.  From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct who conduct firearms investigations, I am aware of the following:

a.  Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical

control, such in their digital devices.  It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals.  Such information is also kept on digital devices.

b.   Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices.  These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

c.   Those who illegally possess firearms often sell their firearms and purchase firearms.  Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices.  This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price.  In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

d.    Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

## VI. <u>TRAINING AND EXPERIENCE ON DRUG OFFENSES</u>

40.    Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.    Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.    Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

c.    Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion

of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.   Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

e.   Individuals engaged in the illegal purchase or sale of drugs and other contraband often use multiple digital devices.

### VII. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>

41.  As used herein, the term "digital device" includes the SUBJECT DEVICES.

42.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the

16

hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading

filenames and extensions.  Digital devices may also contain
"booby traps" that destroy or alter data if certain procedures
are not scrupulously followed.  Law enforcement continuously
develops and acquires new methods of decryption, even for
devices or data that cannot currently be decrypted.

43.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that it can take a substantial period of time to search a
digital device for many reasons, including the following:

a.  Digital data are particularly vulnerable to
inadvertent or intentional modification or destruction.  Thus,
often a controlled environment with specially trained personnel
may be necessary to maintain the integrity of and to conduct a
complete and accurate analysis of data on digital devices, which
may take substantial time, particularly as to the categories of
electronic evidence referenced above.

b.  Digital devices capable of storing multiple
gigabytes are now commonplace.  As an example of the amount of
data this equates to, one gigabyte can store close to 19,000
average file size (300kb) Word documents, or 614 photos with an
average size of 1.5MB.

c.  The large number of digital devices recovered and
the large number of involved individuals will significantly
increase the amount of time necessary to analyze all devices and
determine ownership of devices when possible.

44.  The search warrant requests authorization to use the
biometric unlock features of a device, based on the following,

which I know from my training, experience, and review of
publicly available materials:

        a.   Users may enable a biometric unlock function on
some digital devices.  To use this function, a user generally
displays a physical feature, such as a fingerprint, face, or
eye, and the device will automatically unlock if that physical
feature matches one the user has stored on the device.  To
unlock a device enabled with a fingerprint unlock function, a
user places one or more of the user's fingers on a device's
fingerprint scanner for approximately one second.  To unlock a
device enabled with a facial, retina, or iris recognition
function, the user holds the device in front of the user's face
with the user's eyes open for approximately one second.

        b.   In some circumstances, a biometric unlock
function will not unlock a device even if enabled, such as when
a device has been restarted or inactive, has not been unlocked
for a certain period of time (often 48 hours or less), or after
a certain number of unsuccessful unlock attempts.  Thus, the
opportunity to use a biometric unlock function even on an
enabled device may exist for only a short time.  I do not know
all of the passcodes of the devices likely to be found in the
search.

        c.   The person who is in possession of a device or
has the device among his or her belongings is likely a user of
the device.  Thus, the warrant I am applying for would permit
law enforcement personnel to, with respect to any device that
appears to have a biometric sensor and falls within the scope of

19

the warrant: (1) depress GARCIA JIMENEZ's; CHAVEZ's, and
ALONZO's thumb- and/or fingers on the devices; and (2) hold the
devices in front of GARCIA JIMENEZ's; CHAVEZ's, and ALONZO's
face with his eyes open to activate the facial-, iris-, and/or
retina-recognition feature.

45.  Other than what has been described herein, to my
knowledge, the United States has not attempted to obtain this
data by other means.

### VIII.      CONCLUSION

46.  For all of the reasons described above, there is
probable cause to believe that GARCIA JIMENEZ, CHAVEZ, and
ALONZO have violated 21 U.S.C. § 841(a)(1): Possession with
Intent to Distribute a Controlled Substance.  There is also
probable cause that the items to be seized described in
Attachment B will be found in a search of the SUBJECT DEVICES
described in Attachment A.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this __26__ day of
January , 2023.


_____
THE HONORABLE Michael R. Wilner
UNITED STATES MAGISTRATE JUDGE